UNITED STATES v. EDGAR.

(District Court, D. Montana. August 29, 1905.)

No. 111.

1. PUBLIC LANDS—CUTTING TIMBER FROM MINERAL LANDS—CONSTRUCTION OF STATUTE.

The right to cut timber from public mineral lands, subject to mineral entry only, for building, agricultural, mining, or other domestic purposes, given to any bona fide resident of certain states and territories by Act June 3, 1878, c. 150, 20 Stat. 88 [U. S. Comp. St. 1901, p. 1528], extends to all such lands in the state or territory, without limitation to any local subdivision.

2. SAME—TERRITORIAL LIMITATION OF RIGHT—PURPOSES OF USE.

Under such statute, a resident of Montana, where he observes the regulations made by the Secretary of the Interior for the protection of undergrowth, etc., may lawfully cut timber for firewood from public mineral lands within the state, and ship the same to any part of the state for sale and use there in households, hoisting works in mines, smelters, or other local purposes, all of which are "domestic" purposes within the meaning of the statute.

Action for Timber Trespass.

Carl Rasch, U. S. Atty.

McBride & McBride, for defendant.

HUNT, District Judge. This action is brought by the plaintiff against the defendant to recover judgment against the defendant in the sum of $18,750, alleged to be the aggregate value of 15,000 cords of wood taken from the lands of the plaintiff by the defendant and converted to his own use and benefit. By stipulation, the question of the liability of the defendant has been submitted to the court for decision, upon the following facts, agreed and conceded to be those in the cause:

First. That the plaintiff is the owner of certain tracts of unsurveyed lands, which are described in the complaint, situated in Powell county, state of Montana. Second. That the lands described are mineral in character, and that, prior to June 15, 1902, the defendant, who was a bona fide resident of the state of Montana, entered upon the lands described and cut and removed therefrom 15,000 cords of wood, manufactured from timber a portion of which was growing upon the said lands and premises described; that the whole of said cordwood was taken and appropriated by the defendant, and removed by him, to be sold in the general market within the state of Montana; and all of said cordwood was sold by said defendant in the general market as follows, to wit: 750 cords in Helena, and were there used for household purposes; 1,850 cords in Powell county, and were there used in burning lime rock and manufacturing it into lime; 12,400 cords in Butte, of which amount approximately 7,400 cords were used for household purposes and 5,000 cords for smelting ores at Butte and for operating hoisting works at the mines of Butte. Third. That in the cutting of said cordwood defendant complied with the rules and regulations of the Secretary of the Interior governing the piling up and caring for the brush and rubbish resulting from such cutting; that the defendant cut no trees less than 18 inches in diameter, and no part of said cordwood was exported from the state of Montana; that the lands upon which the cordwood was cut, and from which the same was removed, is situated in Powell county, but of said cordwood 13,150 cords were removed and shipped, as hereinbefore set out, where the same was disposed of and sold; that the distance from the place where the said cordwood was cut to the city of Helena is 35 miles, the distance from the place where the cordwood was cut to the place where it was used in the manufacture of lime in Powell county is 9 miles, and the distance from the place where the cordwood was cut to the city of Butte, where 12,400 cords were used, is 35 miles. Fourth. That the cutting of said cordwood by the defendant, and its removal from Powell county, Mont., to the cities of Butte and Helena, Mont., was done under the provisions of the act of June 3, 1878, entitled "An act authorizing citizens of Colorado, Nevada, and the territories to fell and remove timber on the public domain for mining and domestic purposes." Fifth. That if, upon the foregoing facts, the court shall rule that the defendant was entitled to cut and remove said cordwood and dispose of the same in the manner as hereinbefore stated under the provisions of said act of Congress of June 3, 1878, then the action shall be dismissed; but if the court, upon the facts as stated, shall rule that the defendant was not authorized under said act to cut said cordwood and remove the same from Powell county to the cities of Butte and Helena, and that he is liable for the value thereof, evidence upon the question of value may thereafter be introduced by plaintiff and defendant upon a day to be fixed by the court.

Do the facts of this case distinguish it, so that the construction put upon the act of Congress of June 3, 1878, by the Circuit Court of Appeals, in United States v. Rossi (1904) 133 Fed. 380, 66 C. C. A. 442, and more recently by the Supreme Court in United States v. United Verde Copper Company (1905) 196 U. S. 207, 25 Sup. Ct. 222, 49 L.

Ed. 449, is not applicable and controlling? To this question I shall briefly address my attention.

United States v. Rossi, supra, was an action to recover the value of a certain quantity of lumber, claimed by the United States to have been unlawfully cut from the public domain in Idaho, during 1899 and up to 1903, by the defendants therein, and manufactured by them into lumber and converted to their own use. The defendants there admitted that they were manufacturers and dealers in lumber when the timber was cut, and admitted the cutting, but justified upon the ground that the land was mineral, that the lumber manufactured from the timber cut was sold for domestic, agricultural, mining, and building uses in the vicinity of Boise City and within the general district and state wherein the timber was cut, and pleaded that no portion thereof was exported from the state, that in cutting and removing the timber then in question defendants had complied with the rules and regulations of the Secretary of the Interior then in force, and that because of these several facts defendants were licensed and privileged to cut and remove the timber in question by Act Cong. June 3, 1878, c. 150, 20 Stat. 88 [U. S. Comp. St. 1901, p. 1528], entitled "An act entitling the citizens of Colorado, Nevada, and the territories to fell and remove timber on the public lands for mining and domestic purposes." The contention of the government was that the defendants acted unlawfully in cutting and removing the timber, and manufacturing the same into lumber "for the purpose of sale and traffic out of the district where cut," thus violating the rules and regulations of the Secretary of the Interior. The Circuit Court overruled this contention, and thereafter the question involved was submitted to the Court of Appeals. In the opinion of the latter court, the reasons for the enactment of the statute are quite fully set forth, not alone as they appeared in original opinion of the judges, but as they had been previously laid down in the views of Secretary Teller, found in 1 L. D. 607. Speaking for itself the Court of Appeals says:

"The intention of Congress in enacting this law was to enable settlers in the regions where timber is scarce to utilize it for domestic and mining purposes, and especially to develop the mineral resources of the rough mountainous districts, where agricultural pursuits could not be profitably followed."

In accord with this policy, up to 1900, the Interior Department expressly recognized the right to cut timber and manufacture it for sale to citizens of the state or territory in which the timber grew for building, agricultural, mining, or other domestic purposes; and in the light of the conditions existing when the act of 1878 was passed, the construction put upon it by Secretary Teller was well calculated to make its real purposes effectual. Colorado, Nevada, Montana, Idaho, Utah, and the other states and territories named in the first clause of the act, were all mining regions, comparatively speaking, undeveloped in any permanent resources, except mining. Undoubtedly, therefore, special concern for the further development of mining, and the encouragement of other development to come with that of mining, moved Congress to grant the permission contained in the statute, upon proper conditions and subject to the restrictions of rules and regulations of the Secretary of the Interior. Only citizens or residents were allowed the privi-

lege; the timber could be cut only for building, agricultural, mining, and other domestic purposes; it could be cut only upon mineral lands; and it could only be cut subject to such rules as the Secretary of the Interior might prescribe for the protection of the timber and of the undergrowth growing upon said lands, and for other purposes.

Looking at the history of the mountain mining states since 1878, we find mining operations have extended so as to require immense supplies of timber; exploitation and discoveries have led to construction of smelters, mills, and factories necessary and proper to mining operations; while in turn, concurrently with the growth of mining and primarily due thereto, agriculture has progressed, manufacturing has grown, building has gone on, until those sections included within the original act, and which were regarded as chiefly wealthy in minerals, have become of incalculable value for agriculture, and are full of promise for manufacture, apart from mining. So the Court of Appeals of this circuit was of opinion that the act was intended to be liberal in its scope, and they placed upon its language a construction which permits cutting for manufacture and sale within the state where the timber grows, holding that rules 5 and 7 of the Interior Department, issued February 15, 1900, abridged the permission given by Congress, and hence were unauthorized and in excess of the authority conferred upon the secretary.

But the case can well be disposed of by referring to the recent adjudication of the Supreme Court in United States v. United Verde Copper Co., supra. This decision was rendered but a few months after the Court of Appeals passed upon the statute involved in United States v. Rossi, supra. The United States brought action against the United Verde Copper Company for a large sum of money, the value of timber cut and removed from certain unsurveyed mineral land in the territory of Arizona. It was alleged that the timber belonged to the United States, and was used and consumed by the defendant for the purpose of roasting ore at the defendant's mines in Arizona, in violation of the act of Congress of June 3, 1878, heretofore referred to, and of the rules and regulations of the Secretary of the Interior, promulgated under the authority of the act of Congress. No fact was disputed; the pleading of the United States being tested by demurrer of the defendant company. In the brief of the counsel for the United States, as reported, it was urged upon the attention of the court that, when Congress authorized and permitted citizens and persons, bona fide residents of the states and territories named in the act, to fell and remove "for building, agricultural, mining, or other domestic purposes" any timber growing on public mineral lands, not subject to entry, except for mineral entry, subject to such rules as the Secretary of the Interior might prescribe for the protection of the timber and undergrowth and for other purposes, the word "domestic" was used as belonging to the household, and that, as the statute was permissive and granted property privileges, if the real intention was not ascertainable from the words used, the character of the act should receive consideration, and a construction obtain which strictly favored the government. The court rejected this argument, and held that the permission of the statute is not confined to building, agricultural, and mining purposes,

but extends to "other domestic purposes," which "may relate to a broader entity than the household." Justice McKenna said:

"We may properly and accurately speak of domestic manufactures, meaning not those of the household, but those of a county, state, or nation, according to the object in contemplation. So in the statute the word 'domestic' applies to the locality to which the statute is directed, and gives permission to the industries there practiced to use the public timber. This definition of 'domestic' gives the word an apt and sensible meaning, and we must regard the association of the word 'other' with it as designed, not as accidental."

It was also decided that rule 7 of the rules promulgated by the Secretary of the Interior on January 18, 1900, which provided that no timber could be used for smelting purposes, "smelting being a separate and distinct industry from that of mining," was an attempt to take away from one of the industries designated by Congress the license given it, and that such a power was not regulation, and hence could not be lawfully exercised. The power of the secretary being, therefore, one to regulate only, and not to abridge by definition of the terms, except, perhaps, as the industries meant by the general clause "may be limited to the conditions existing in the mining states and territories when the statute was enacted," the courts, following the general view of the Supreme Court, must continue to give to the whole act, as well as to the words "other domestic purposes," a somewhat broad application, and to consider it with relation to the "locality" to which it is pertinent, and to the industries practiced in such locality.

Proceeding upon this principle, the only limitation upon the place where the timber may be cut is that it shall be within the state, territory, or district of which the citizen authorized to cut may be at the time a bona fide resident, subject, of course, to regulations by rule of the Interior Department. It would not do to put a restriction upon the locality by confining the permission to cut to the immediate neighborhood, or even to the county; for the practical effect of doing so would be to deprive many entitled to the benefits conferred. For instance, suppose a mining mill is erected at Butte. Formerly, when the act was passed, the town was situate within a very large county of the then territory of Montana. Within reasonably close distance to the town, say twenty miles, were areas of timber upon mineral lands not entered. As mining developed, however, population rapidly increased, smelters were built, building was carried on, houses were constructed, farming lands in the neighboring valleys were settled upon, and in various ways the demand for timber in carrying on domestic industries multiplied very fast. In meeting this demand the timber near by was first cut; but as lands were entered, naturally the area for cutting diminished, while, on the other hand, the industries continued to be extended and population grew, thus still further increasing the needs for timber. Soon the county was divided, and its boundaries were contracted. Then the timber had to be cut upon mineral lands not entered in other counties still farther away, until, as time has passed, railroads have been found necessary to convey it for considerable distances to the city where the industries utilizing it are principally centered. In the light of these facts and similar instances of common knowledge in the history of the Western states, how can it be well contended that Con-

gress meant to restrict the cutting for domestic purposes to any partic-ular locality of the state or territory?

The courts cannot import into the act a limitation as to the location of the land from which the timber may be taken, where Congress has conferred authority to cut for the purposes stated on the public lands, mineral and not entered, in the state of which the citizen or person may be a resident. To do so would be in effect to limit the permission—to restrict to an area less than the state a benefit which, by the law, may be enjoyed wheresoever timber grows on public mineral lands not entered within the state. Let it not be understood that the full power of regulation may not be exercised, or that anything here said means to abridge that power in any way whatsoever, if properly exercised. What is here decided, however, is that, Congress having designated the extent of the locality from which the timber may be cut, no construction can limit the area, and thus abridge or take away from the persons lawfully engaged in the industries designated by Congress the right to enjoy the license given, any more than it might enlarge the privilege by giving license to cut beyond the limits of the state or territory, or other district of which the citizen or person may be at the time a bona fide resident.

The argument that the construction here placed upon the act may result in the destruction of all timber upon public mineral lands cannot prevail against the broad provisions of the act, as understood and sustained, not alone by the Circuit Court in the case of United States v. Richmond Mining Company (C. C.) 40 Fed. 415, and the later cases already cited, but as fairly recognized by the rules of the Interior Department up to 1900. It is significant, too, that Congress has carefully guarded the right to cut timber in the whole state or territory by legislation subsequent to the act under examination. By Act March 3, 1891, c. 559, 26 Stat. 1093 [U. S. Comp. St. 1901, p. 1531], entitled "An act to amend section eight of an act approved March 3, 1891, entitled 'An act to repeal timber culture laws and for other purposes,'" it was provided that in any criminal prosecution or civil action by the United States for a trespass on the timber lands referred to in the act, or to recover for timber or lumber cut thereon, it should be a defense if the defendant should show that the timber was so cut or removed from the timber lands for use in such state or territory by a resident thereof, for agricultural, manufacturing, mining, or domestic purposes, under rules and regulations made and prescribed by the Secretary of the Interior, and has not been transported out of the same, and it was expressly enacted that this act last referred to should not operate to repeal the act of June 3, 1878, providing for the cutting of timber on mineral lands. United States v. Price Trading Company, et al., 109 Fed. 239, 48 C. C. A. 331.

Finally, my conclusion is that the grant of permission, when construed with reference to the conditions existing when the statute was enacted, extends to public mineral lands not subject to entry except for mineral in the state, without limitation as to any locality within the state, subject always to regulation by rules of the Secretary of the Interior. I recognize that much may be said against the continuance of the policy of the law, and it is unquestionably true that abuses

have been committed under it; but, as the Court of Appeals said in its opinion in the Rossi Case, supra:

"Whether or not this policy should be continued to permit the carrying on of any extensive business in the manufacture and sale of lumber, not only to the miners, but for all the uses of the cities which may grow up by reason of the mining industry, and without compensation to the government for the timber required for such purposes, may reasonably be questioned; but until Congress closes the door which was so widely opened by the passage of this act, or limits its benefits to some specified amount or degree, the courts must continue to give effect to its provisions."

The action is dismissed.